## MORRIS A. CHAPSKY v. JOSEPH H. WOOD, *et al.*

1. PARENTS, *Rights and Duties of.* The parents are the natural guardians and *prima facie* entitled to the custody of their minor child, as well as chargeable with the obligation of its support.

2. ———— A child is not in any sense like a horse or other chattel, subject-matter for absolute and irrevocable gift or contract.

3. CUSTODY *of Child.* A parent's right to the custody of a child is not like the right of property, an absolute and uncontrollable right. It will never be enforced where its enforcement will obviously destroy the happiness and well-being of the child.

4. GIFT OF CHILD, *Reclamation of; Things Considered by Courts.* While the mere gift of a child is revocable, yet if reclamation is sought by proceedings in *habeas corpus*, the courts will consider the welfare of the child in determining whether to sustain the right and award possession to the parent. If reclamation be sought immediately after the gift, and

the parent be not obviously an unfit person by reason of immoralities, etc., the courts will as a rule consider the child's welfare as promoted by a return to its parent, and will pay little attention to prospective advantages of wealth, social position, or otherwise, held out on the other side; but if, on the other hand, reclamation is not sought till after the lapse of many years, till the child has formed other ties, and a different direction has been given to its course of life, then the courts may properly give weight to the condition of the child's present surroundings and all advantages which a continuance in those surroundings may reasonably be expected to give.

5. RIGHTS *to be Regarded.* In such cases three rights or interests are to be regarded: first, that of the parent; second, that of those who have for years discharged all the obligations of parents; and third, and chiefly, that of the child.

6. ———— Upon the facts in this case, the custody of the child is remanded to the respondents; and the petition is denied, at the cost of the petitioner.

*Original Proceedings in Habeas Corpus.*

PETITION for a writ of *habeas corpus,* filed in this court by *Morris A. Chapsky,* October 11, 1881. For the petitioner, counsel were *Howell Jones, J. D. McFarland, John Martin,* and *J. D. S. Cook.* For the respondents, *Joseph H. Wood* and wife, counsel were *George R. Peck* and *L. C. Slavens.* The case was argued orally by Messrs. *Martin, McFarland* and *Cook* for the petitioner, and by Messrs. *Peck* and *Slavens* for the respondents. November 4, 1881, the opinion herein was filed.

The opinion of the court was delivered by

BREWER, J.: In this case of the petition of Morris A. Chapsky for the possession of his minor child, counsel have in their arguments expressed very feelingly and truthfully the embarrassments and difficulties which surround the decision of a case like this. These arise, not because there is a conflicting question of fact to be settled by the court, for that is a matter of every-day occurrence in judicial proceedings; it is not that it is a question between a grown man on one side and a grown woman on the other, for we could dispose of every question affecting simply them, without any embarrass-

ment or hesitation. The burden of the case is, that the decision is one which involves the future welfare of a little girl; and I think no man can look upon the face of a bright and happy little girl, like the one before us, and come to a decision of a question which may make or mar her future life, without hesitation and feeling: certainly we are not so insensible as to be able to do it.

The questions of law which are involved in a case like this are few in number, and, I think, not subject to much doubt. They may be summed up briefly thus: The father is the natural guardian and is *prima facie* entitled to the custody of his minor child. This right springs from two sources: one is, that he who brings a child, a helpless being, into life, ought to take care of that child until it is able to take care of itself; and because of this obligation to take care of and support this helpless being arises a reciprocal right to the custody and care of the offspring whom he must support; and the other reason is, that it is a law of nature that the affection which springs from such a relation as that is stronger and more potent than any which springs from any other human relation.

The second proposition of law is, that a child is not in any sense like a horse or any other chattel, subject-matter for absolute and irrevocable gift or contract. The father cannot, by merely giving away his child, release himself from the obligation to support it, nor be deprived of the right to its custody. In this it differs from the gift of any article which is only property. If to-day Morris Chapsky should give a horse to another party, that gift is for all time irrevocable, and the property never can be reclaimed; but he cannot by simply giving away his child relieve himself from the obligation to support that child, nor deprive himself of the right to its custody.

I might say here, that the statute has provided for a relinquishment through probate court proceedings, which may be considered (but that is outside this case) irrevocable.

The third proposition is, that a parent's right to the custody

of a child is not like the right of property, an absolute and uncontrollable right. If it were, it would end this case and relieve us from all future difficulties. A mere right of property may be asserted by any man, no matter how bad, immoral, or unworthy he may be; but no case can be found in which the courts have given to the father who was a drunkard and a man of gross immoralities, the custody of a minor child, especially when that child is a girl. The fact that in such cases the courts have always refused the father the custody of his child, shows that he has not an absolute and uncontrollable right thereto.

The fourth proposition is, that though the gift of the child be revocable, yet when the gift has been once made and the child has been left for years in the care and custody of others, who have discharged all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly upon the question whether such custody will promote the welfare and interest of such child. This distinction must be recognized. If, immediately after the gift, reclamation is sought, and the father is not what may be called an unfit person by reason of immorality, etc., the courts will pay little attention to any mere speculation as to the probability of benefit to the child by leaving or returning it. In other words, they will consider that the law of nature, which declares the strength of a father's love, is more to be considered than any mere speculation whatever as to the advantages which possible wealth and social position might otherwise bestow. But, on the other hand, when reclamation is not sought until a lapse of years, when new ties have been formed and a certain current given to the child's life and thought, much attention should be paid to the probabilities of a benefit to the child from the change. It is an obvious fact, that ties of blood weaken, and ties of companionship strengthen, by lapse of time; and the prosperity and welfare of the child depend on the number and strength of these ties, as well as on the ability to do all which the promptings of these ties compel.

The fifth proposition is, that in questions of this kind three interests should be considered: The right of the father must be considered; the right of the one who has filled the parental place for years should be considered. Perhaps it may not be technically correct to speak of that as a right; and yet, they who have for years filled the place of the parent, have discharged all the obligations of care and support, and especially when they have discharged these duties during those years of infancy when the burden is especially heavy, when the labor and care are of a kind whose value cannot be expressed in money — when all these labors have been performed and the child has bloomed into bright and happy girlhood, it is but fair and proper that their previous faithfulness, and the interest and affection which these labors have created in them, should be respected. Above all things, the paramount consideration is, what will promote the welfare of the child? These, I think, are about all the rules of law applicable to a case of this kind.

Now, passing to the facts, which I shall only outline: Morris A. Chapsky married the mother of this child ten years ago. The marriage was not acceptable to his parents, though for no reason that we are advised of, involving the character of any of the parties. Returning home immediately after his marriage, the father, commenting upon the fact of the marriage, which had been made without his consent, was not satisfied, and bade him start out for himself. Some criticism has been placed upon this conduct, which, we think, is not deserved. It is often best for a young man that he should be turned out upon his own resources and compelled to struggle for himself; and that his father was not destitute of affection for his child, is patent, from the fact that he made him a gift of money largely in excess of that which most young men have to start with. Whether his judgment was good, or otherwise, cuts no figure in this case. He started out with this money, and wandered around, as a young man is apt to do, and, drifting from place to place, finally came penniless to Kansas City. He struggled for a series of years under pecuniary embarrass-

ment; and during these years this child was born. His wife's health was delicate, and she was obviously unable to discharge ordinary household duties, even without the care of this child; and the respondent, Mrs. Wood, her sister, kindly provided for her during her confinement, and took care of the child. The child was left with her (Mrs. Wood), and from that day to this, a period of about five and one-half years, has been all the time in her custody. During the very early infancy of the child, the question arose as to her custody — Mrs. Wood insisting that the mother should take the child, or that it should be given to her. It is clear that this matter of discussion between the parties lasted for some time, and we are satisfied from the testimony that in fact a gift was made of the child by both mother and father, to Mrs. Wood. The mother's letters exhibit this; and while the father does not recollect of having made such gift, we are convinced that he did so, and by parol agreement relinquished to the respondents his parental rights. No writing passed between them; but regarding as we do that a gift is not decisive in the case, unless made in accordance with the statutory form, the want of a writing cuts no figure now. The child was given to Mrs. Wood, and has been in her care for five years and a half — from the date of its birth to the present day. What the future of the child will be, is a question of probability. No one is wise enough to forecast, or determine absolutely, what or what would not be best for it; yet we have to act upon these probabilities from the testimony before us, guided by the ordinary laws of human experience. Involved in the question as to what will promote the welfare of the child, are questions of wealth; questions of social position, questions of health, questions of educational advantages, moral training — of all things, in short, which will tend to develop a little girl into a perfect woman.

And first, we remark that the child has had, and enjoys to-day, good advantages, and its welfare has been promoted, and is promoted to-day. No one has said that this child has lacked anything which a child should have, and the testi-

mony all shows that it has been cared for most patiently and faithfully — as well as it could have been cared for by any one; and to that care the face and appearance of the child abundantly testify. This fact does not rest on probabilities. It is a serious question, always to be considered, whether a change should be advised. "Let well enough alone," is an axiom founded on abundant experience. There is nothing in the present situation of the respondents, their pecuniary condition, the business capacity of the husband, their social position, their affection for this child — absolutely nothing which tends in any way to suggest that the welfare of the child which has been promoted in the past, would be limited or abridged in the future. What they have done for the child tends to show what they will do through the future years of its girlhood. What that has been is certainly as much, and I think more, than the average child receives.

Again, while there is more wealth on the side of the father, and pecuniary advantages are held out for her future — greater than those, perhaps, which the respondents can present — yet we cannot be insensible to the surroundings under which the child would be placed if committed to its father. The grandfather has been on the stand before us, and not merely from the testimony adduced from his relatives and neighbors, but from his appearance and manner on the stand, evidently he is a gentleman of character and responsibility, not destitute of affection, and one who has provided a comfortable home and is in a position to give to the child all these advantages. Yet the child if it goes, goes to the care of its father; and while there is no testimony showing that the father is what might be called an unfit person, that his life has not been a moral one, yet we can but think that it is developed, both by testimony and his manner and appearance on the stand, that there is a coldness, a lack of energy, and a shiftlessness of disposition, which would not make his personal guardianship of the child the most likely to ripen and develop her character fully. He seems to us like a man still and cold, and a warm-hearted child would shrink and wither under care of

such a nature, rather than ripen and develop. These are facts that we can but notice, and they have in them no imputation against the father of an unkind nature or immoral life; but the facts as they impress us are, that the child would not really grow to its fullest promise under the care of such a man.

Again, and lastly, the child has had, and has to-day, all that a mother's love and care can give. The affection which a mother may have and does have, springing from the fact that a child is her offspring, is an affection which perhaps no other one can really possess; but so far as it is possible, springing from years of patient care of a little, helpless babe, from association, and as an outgrowth from those little cares and motherly attentions bestowed upon it, an affection for the child is seen in Mrs. Wood that can be found nowhere else. And it is apparent, that so far as a mother's love can be equaled, its foster-mother has that love, and will continue to have it.

On the other hand, if she goes to the house of her father's family, the female inmates are an aunt, just ripening into womanhood, and a grandmother; they have never seen the child; they have no affection for it springing from years of companionship. While she is a child of perhaps a favorite son or brother, she is also the child of a disowned or repudiated daughter-in-law and sister-in-law, and the appeal which the child will make naturally—and the child is one to make a strong appeal to anyone—will always be shadowed and clouded by the fact that she comes from one who was not a favorite in that family.

Human impulses are such that doubtless they would form an affection for the child—it is hardly possible to believe otherwise; but to that deep, strong, patient love which springs from either motherhood, or from a patient care during years of helpless babyhood, they will be strangers.

They cannot have this; and to my mind, I am frank to say, this last is the controlling consideration. And these three considerations are those which compel us to say that we cannot

42—26 KAS.

believe it wise or prudent to take this child away from its present home, where it has been looked upon as an own child; and if we should see a child of ours in the same circumstances, we cannot believe that we should deem it wise or prudent to advise a change, notwithstanding the pecuniary advantages that might seem to be offered to it.

The judgment of the court therefore is, that the child will be remanded to the respondents; and the petition is dismissed, at the cost of the petitioner.

All the Justices concurring.